[Civ. No. 15054. Second Dist., Div. Three. Mar. 21, 1946.]

DAVID BERNSTEIN, Respondent, v. REBECCA BERNSTEIN, Appellant.

Milton M. Cohen for Appellant.

Freedman & Christlieb and Henry J. Merdink for Respondent.

DESMOND, P. J.—David Bernstein obtained an interlocutory decree of divorce from his wife Rebecca on the ground of extreme cruelty, the court finding that she "treated plaintiff in a cruel and inhuman manner, which acts and conduct on the part of the defendant caused plaintiff grievous physical and mental suffering." Defendant appeals claiming that there was no corroboration of the important and material facts relied upon by the plaintiff as a basis for his decree; also, that an unreasonable lapse of time occurred before the commencement of the action. She depends upon the provisions of Civil Code sections 130 and 124 as requiring a reversal. The first mentioned section provides that "No divorce can be granted . . . upon the uncorroborated statement, admission, or testimony of the parties . . . but the court must . . . require proof of the facts alleged. . . ." Section 124 provides that "A divorce must be denied: One . . . Two . . . Three. In all other cases when there is an unreasonable lapse of time before the commencement of the action."

No specific acts of cruelty were alleged in the complaint but respondent testified at some length concerning a series of oral onslaughts, criticisms, accusations and misrepresentations directed toward him by his wife. Examples, as related by the plaintiff, follow: nagging continued over a period of years; accusations of misconduct with young women; committing adultery; having abortions performed; paying blackmail to avoid trouble; cheating her in business; and conspiring with others to cheat her. He testified that there was no truth in the charges, but that the defendant made the derogatory

statements not only to him, but to members of his family, to
his friends and to people from whom he bought and to whom
he sold goods. He stated as to her conduct, "It was con-
tinually getting into controversies about all sorts of things,
and mainly accusing me of not having any brains, being a
bad business man and not listening to her advice, and inci-
dentally it would always come up about the terrible family
that I came from." All the grievances concerning which the
plaintiff testified occurred before the separation of the parties
in 1936 in Portugal, where their business of dealing in antiques
had taken them. It was agreed between them at that time
that they would liquidate their properties and each take one-
half thereof. Evidence was produced at the trial from which
the court might have determined that their agreement was
substantially carried out. Shortly after January of 1936
respondent went to New York and later to London and Pales-
tine. It appeared that his wife lived with him briefly in each
of those places but their conjugal relations were not con-
tinued after 1938, according to appellant; after 1936, accord-
ing to respondent.

The suit was not filed until 1944, eight years after the
Portugal separation and, at the trial in 1945, plaintiff pro-
duced for corroboration two witnesses, his son by a former
marriage and his brother.

The son testified that he had known his stepmother for
more than thirty years and "if I recall, she has always made
representations that my father cheated her, that she was not
getting a square deal, that she was the brains of the business,
and she claims she was the one that was supporting my sister
and myself over a period of twenty-five years, and she always
accused my father of having different women in the different
parts of the country and in the world. . . . Well, this has
been going on over a period of many years, over thirty years.
I remember I lived with them once in Philadelphia, and they
used to fight then; that is, for some reason or other, and it
was always in the background of her mind, was some other
woman, so I cannot say who or why, but that has been over
thirty years, as long as I can remember." As to his father's
condition, this witness stated: "Well, over a number of
years he has become very,——I used to call him a mental
wreck. He is very nervous, erratic, a high-tension man, he
cannot conduct a business, he has got at a state where I had
to bring him out here to bring him under my doctor's care."

The respondent testified that as a result of his wife's continued nagging and accusing him of improprieties over a period of years, "I could not stand it any longer, I got so nervous, lost weight, and I just simply could not stand it any longer, I simply left. Q. And have you lived together since that time? A. No, sir. Q. And that is the place where the separation took place? A. Yes, sir, in January of 1936. Q. And you went back, ultimately, to New York? A. Yes. Q. And you have not had any relations as husband and wife since then? A. No, sir. Q. How did this course of treatment . . . affect you? A. It affected my health, made me extremely nervous, and it had some physical effect, I don't know what the technical term is, but I am under treatment for the last two years now. Q. You are under a doctor's care now? A. I could not carry on my business, and my son told me to come out here to this climate, and incidentally go to his physician. Q. Are you under a doctor's care now? A. Yes, I have been for about two years. Q. How old a man are you? A. Sixty-seven."

The brother of respondent testified that as late as November, 1944, appellant had made statements to him, accusing her husband of certain happenings which occurred prior to 1936, namely, adultery and dishonesty in business transactions with her. Also, "that he had affairs with girls under age, and that they were blackmailing him, that he was using up the money to pay these women for the trouble that he had got into."

The appellant, in her answer to the complaint, denied the allegations of her mistreatment of her husband and in defense alleged that he deserted her in 1938 and asked that she be awarded a reasonable sum with which to support and maintain herself. At the trial she denied nagging the respondent, but admitted that she had accused him of misconduct with various women and girls. "I accused him under the conditions of what he told me himself, he bragged about them."

On this subject respondent testified as follows: "Q. Did you brag to her about having improper relations with other girls? A. Definitely not; who would? Q. But at least you did not? A. I did not, definitely not. Q. Does that apply to girls both in this country and in London? A. In every country. Q. You never at any time bragged to her about having improper relations? A. Definitely not."

■ We are satisfied, in view of the matters brought out at the hearing, that the evidence of respondent concerning ill treatment by his wife was sufficiently corroborated to warrant the decision of the trial judge in his favor. ■ Appellant's claim that there was in this case an unreasonable lapse of time between the acts complained of and the filing of the suit would have been proper for the trial court to consider if it had been submitted, but there is nothing in the pleadings or transcript to indicate that the question was ever raised. In *Moffitt* v. *Moffitt* (1933), 128 Cal.App. 676, at page 678 [18 P.2d 387], the following statement is made: "The question whether the lapse of time in bringing an action for divorce or separate maintenance is reasonable or not is one which the trial court must determine." See, also, *Strupelle* v. *Strupelle* (1922), 59 Cal.App. 526, 529 [211 P. 248].

The judgment is affirmed.

Shinn, J., and Wood, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 16, 1946.